# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

BRENDA MARTIN,                )
                              )
                              )
    Plaintiff,                )
v.                            )
                              )
SOCIAL                        )     **Case No.: 4:25-cv-1048-AMM**
SECURITY                      )
ADMINISTRATION,               )
Commissioner,                 )
                              )
    Defendant.                )

## MEMORANDUM OF DECISION

Plaintiff Brenda Martin brings this action pursuant to the Social Security Act (the "Act"), seeking review of the decision of the Commissioner of Social Security ("Commissioner") denying her claim for a period of disability and disability insurance benefits ("benefits") and supplemental security income. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). Based on the court's review of the record, the court **AFFIRMS** the decision of the Commissioner.

## I.      Introduction

On June 3, 2022, Ms. Martin protectively filed an application for disability and disability insurance benefits under Title II of the Act, alleging disability beginning May 1, 2020. R. 10, 72. Also on June 3, 2022, Ms. Martin protectively filed an application for supplemental security income under Title XVI of the Act,

alleging disability as of May 1, 2020. R. 10, 73. Ms. Martin alleges disability due to diabetes type 2, spinal stenosis (L4 and L5), transitional vertebra, chronic lumbar pain, peripheral neuropathy, lack of balance/coordination, walks with a limp, vertigo, GERD, and high blood pressure. R. 74, 86.

The Social Security Administration ("SSA") initially denied Ms. Martin's application on May 5, 2023, and again denied it upon reconsideration on January 9, 2024. R. 10, 72–121. On January 19, 2024, Ms. Martin filed a request for a hearing before an Administrative Law Judge ("ALJ"). R. 10, 155–56. That request was granted. R. 171–73. Ms. Martin received a telephone hearing before ALJ George W. Merchant on June 3, 2024. R. 10, 30–49. On June 24, 2024, ALJ Merchant issued a decision, finding that Ms. Martin had not been under a disability from May 1, 2020, through the date of his decision. R. 10–24. Ms. Martin was fifty-one years old at the time of the ALJ decision. R. 23.

Ms. Martin appealed to the Appeals Council, which denied her request for review on April 30, 2025. R. 1–3. After the Appeals Council denied Ms. Martin's request for review, R. 1–3, the ALJ's decision became the final decision of the Commissioner and subject to district court review. On June 30, 2025, Ms. Martin sought this court's review of the ALJ's decision. *See* Doc. 1.

## II.    The ALJ's Decision

2

The Act establishes a five-step test for the ALJ to determine disability. 20 C.F.R. §§ 404.1520, 416.920. *First*, the ALJ must determine whether the claimant is engaging in substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). "Substantial work activity is work activity that involves doing significant physical or mental activities." 20 C.F.R. §§ 404.1572(a), 416.972(a). "Gainful work activity" is work that is done for pay or profit. 20 C.F.R. §§ 404.1572(b), 416.972(b). If the ALJ finds that the claimant engages in substantial gainful activity, then the claimant cannot claim disability. 20 C.F.R. §§ 404.1520(b), 416.920(b). *Second*, the ALJ must determine whether the claimant has a medically determinable impairment or a combination of medical impairments that significantly limits the claimant's ability to perform basic work activities. 20 C.F.R. §§ 404.1520(a)(4)(ii), (c), 416.920(a)(4)(ii), (c). Absent such impairment, the claimant may not claim disability. *Id*. *Third*, the ALJ must determine whether the claimant's impairment meets or medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.926. If such criteria are met, the claimant is declared disabled. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

If the claimant does not fulfill the requirements necessary to be declared disabled under the third step, the ALJ still may find disability under the next two steps of the analysis. The ALJ must first determine the claimant's residual functional

3

capacity, which refers to the claimant's ability to work despite her impairments. 20 C.F.R. §§ 404.1520(e), 404.1545, 416.920(e), 416.945. In the *fourth* step, the ALJ determines whether the claimant has the residual functional capacity to perform past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). If the ALJ determines that the claimant is capable of performing past relevant work, then the claimant is deemed not disabled. *Id*. If the ALJ finds the claimant unable to perform past relevant work, then the analysis proceeds to the *fifth* and final step. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). In this step, the ALJ must determine whether the claimant is able to perform any other work commensurate with her residual functional capacity, age, education, and work experience. 20 C.F.R. §§ 404.1520(g)(1), 416.920(g)(1). Here, the burden of proof shifts from the claimant to the Commissioner to prove the existence, in significant numbers, of jobs in the national economy that the claimant can do given her residual functional capacity, age, education, and work experience. 20 C.F.R. §§ 404.1520(g)(1), 404.1560(c), 416.920(g)(1), 416.960(c).

The ALJ found that Ms. Martin had not engaged in substantial gainful activity since May 1, 2020, the alleged onset date. R. 12. The ALJ decided that Ms. Martin had the following severe impairments: type 2 diabetes, hypertension, lumbar degenerative disc disease, spondylolisthesis, stenosis, and radiculitis at L4-5, status post right knee arthroscopy with partial medial meniscectomy, depression, anxiety,

obesity, and vertigo. R. 13. The ALJ determined that Ms. Martin did not have "an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments" to support a finding of disability. R. 13.

The ALJ found that Ms. Martin had the "residual functional capacity to perform light work" with certain limitations. R. 15. The ALJ determined that Ms. Martin "can frequently balance and occasionally stoop, kneel, crouch, crawl, and climb ramps and stairs." R. 15. The ALJ determined that Ms. Martin should avoid ladders, ropes, scaffolds, unenclosed heights, commercial driving, hazardous machines, and right-sided foot controls. R. 15. The ALJ determined that Ms. Martin can: attend to simple, repetitive tasks for two-hour periods; if afforded midmorning, lunch, and midafternoon breaks, attend to simple, repetitive tasks over an eight-hour day; have infrequent contact with the public; and have occasional contact with coworkers. R. 15.

The ALJ determined that Ms. Martin's past relevant work was that of a hair stylist. R. 22. According to the ALJ, Ms. Martin "is unable to perform any past relevant work." R. 22. According to the ALJ, Ms. Martin was "a younger individual . . . on the alleged disability onset date," and has "subsequently changed age category to closely approaching advanced age." R. 23. She "has a limited education." R. 23. The ALJ determined that "[t]ransferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a

framework supports a finding that the claimant is 'not disabled,' whether or not the claimant has transferable job skills." R. 23. Because Ms. Martin "cannot perform substantially all of the exertional demands of work at a given level of exertion and/or has nonexertional limitations," the ALJ enlisted a vocational expert to ascertain "the extent to which the claimant's additional limitations erode the unskilled light occupational base." R. 23. That expert testified that "there are occupations represented by significant numbers of jobs in the national economy that such an individual would be able to perform" such as cleaner, housekeeper; assembler, small products; and garment sorter. R. 23–24.

Based on these findings, the ALJ concluded that Ms. Martin had not been under a disability, as defined in the Act, from May 1, 2020, through the date of the decision. R. 24. Ms. Martin now challenges that decision.

## III. Standard of Review

This court's role in reviewing claims brought under the Act is a narrow one. The only issues before this court are whether the record reveals substantial evidence to sustain the ALJ's decision, *see* 42 U.S.C. §§ 405(g), 1383(c)(3); *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), and whether the correct legal standards were applied, *see Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). The Act mandates that the Commissioner's findings are conclusive if supported by "substantial evidence."

*Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *see* 42 U.S.C. §§ 405(g), 1383(c)(3). This court may not reconsider the facts, reevaluate the evidence, or substitute its judgment for that of the Commissioner; instead, it must review the record as a whole and determine if the decision is reasonable and supported by substantial evidence. *See Martin*, 894 F.2d at 1529 (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

Substantial evidence falls somewhere between a scintilla and a preponderance of evidence; "[i]t is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id.* (quoting *Bloodsworth*, 703 F.2d at 1239). If the Commissioner's factual findings are supported by substantial evidence, they must be affirmed even if the preponderance of the evidence is against the Commissioner's findings. *See id.* No decision is automatic, for "[d]espite th[e] deferential standard [for review of claims], it is imperative that th[is] Court scrutinize the record in its entirety to determine the reasonableness of the decision reached." *Bridges v. Bowen*, 815 F.2d 622, 624 (11th Cir. 1987) (citing *Arnold v. Heckler*, 732 F.2d 881, 883 (11th Cir. 1984)). Failure to apply the correct legal standards is grounds for reversal. *See Bowen v. Heckler*, 748 F.2d 629, 635 (11th Cir. 1984).

**IV.  Discussion – The ALJ's Residual Functional Capacity Determination**

Ms. Martin alleges that the ALJ's decision should be reversed because the residual functional capacity "is contrary to law, as it fails to account for the 'total limiting effects' of [her] severe impairments." Doc. 16 at 1 (emphasis omitted). With respect to Ms. Martin's physical residual functional capacity, she specifically argues that the "finding that she can perform the arduous standing/walking requirements of light work" is contrary to law. *Id.* (emphasis omitted). With respect to Ms. Martin's mental residual functional capacity, she specifically argues that the failure to include "interaction impairments . . . with supervisors" is contrary to law. *Id.* (emphasis omitted).

Social Security Ruling 96-8p ("SSR 96-8p") regulates the ALJ's assessment of a claimant's residual functional capacity. Under SSR 96-8p, the residual functional capacity "assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis." SSR 96-8p at *1, 1996 WL 374184 (July 2, 1996). The ruling specifically mandates a narrative discussion of "the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis . . . and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record." *Id.* at *7. Additionally, in cases where symptoms are alleged, the assessment of a claimant's residual functional capacity must: "Contain a thorough discussion and analysis of

the objective medical and other evidence . . . ; Include a resolution of any inconsistencies in the evidence as a whole; and Set forth a logical explanation of the effects of the symptoms . . . on the individual's ability to work." *Id.*

Social Security Ruling 85-15 ("SSR 85-15") provides guidance for evaluating the impact of nonexertional impairments, including mental impairments, on a claimant's ability to perform work. SSR 85-15 at *1, 1985 WL 56857 (January 1, 1985). "The decisionmaker must not assume that failure to meet or equal a listed mental impairment equates with capacity to do at least unskilled work. This decision requires careful consideration of the assessment of" the residual functional capacity. *Id.* at *4. "The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting." *Id.*

A claimant's subjective complaints are insufficient to establish a disability. *See* 20 C.F.R. §§ 404.1529(a), 416.929(a); *Edwards v. Sullivan*, 937 F.2d 580, 584 (11th Cir. 1991). Subjective testimony of pain and other symptoms may establish the presence of a disabling impairment if it is supported by medical evidence. *See Foote v. Chater*, 67 F.3d 1553, 1561 (11th Cir. 1995). The Eleventh Circuit applies a two-part pain standard when a claimant claims disability due to pain or other subjective symptoms. The claimant must show evidence of an underlying medical

condition and either (1) objective medical evidence that confirms the severity of the alleged symptoms arising from the condition, or (2) that the objectively determined medical condition is of such severity that it can reasonably be expected to give rise to the alleged symptoms. *See* 20 C.F.R. §§ 404.1529(a), (b), 416.929(a), (b); Social Security Ruling 16-3p, 2017 WL 5180304, at *3–*4 (Oct. 25, 2017) ("SSR 16-3p"); *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002).

If the first part of the pain standard is satisfied, the ALJ then evaluates the intensity and persistence of a claimant's alleged symptoms and their effect on her ability to work. *See* 20 C.F.R. §§ 404.1529(c), 416.929(c); *Wilson*, 284 F.3d at 1225–26. In evaluating the extent to which a claimant's symptoms affect her capacity to perform basic work activities, the ALJ will consider (1) objective medical evidence, (2) the nature of a claimant's symptoms, (3) the claimant's daily activities, (4) precipitating and aggravating factors, (5) the effectiveness of medication, (6) treatment sought for relief of symptoms, (7) any measures the claimant takes to relieve symptoms, and (8) any conflicts between a claimant's statements and the rest of the evidence. *See* 20 C.F.R. §§ 404.1529(c)(3), (4), 416.929(c)(3), (4); SSR 16-3p at *4, *7–*8. To discredit a claimant's statements, "the ALJ must clearly 'articulate explicit and adequate reasons.'" *See Dyer v. Barnhart*, 395 F.3d 1206 1210 (11th Cir. 2005) (quoting *Foote*, 67 F.3d at 1561–62).

An ALJ's review "must take into account and evaluate the record as a whole." *McCruter v. Bowen*, 791 F.2d 1544, 1548 (11th Cir. 1986). There is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision. *Jacobus v. Comm'r of Soc. Sec.*, 664 F. App'x 774, 776 (11th Cir. 2016). Instead, the ALJ must consider the medical evidence as a whole and not broadly reject the evidence in the record. *Id.*

A credibility determination is a question of fact subject only to limited review in the courts to ensure the finding is supported by substantial evidence. *See Hand v. Heckler*, 761 F.2d 1545, 1548–49 (11th Cir. 1985), *vacated for rehearing en banc*, 774 F.2d 428 (11th Cir. 1985), *reinstated sub nom., Hand v. Bowen*, 793 F.2d 275 (11th Cir. 1986). The Eleventh Circuit will not disturb a clearly articulated finding supported by substantial evidence. *Mitchell v. Comm'r, Soc. Sec. Admin.*, 771 F.3d 780, 782 (11th Cir. 2014). However, a reversal is warranted if the decision contains no indication of the proper application of the pain standard. *See Ortega v. Chater*, 933 F. Supp. 1071, 1076 (S.D. Fla. 1996) (holding that the ALJ's failure to articulate adequate reasons for only partially crediting the plaintiff's complaints of pain resulted in reversal). "The question is not . . . whether [the] ALJ could have reasonably credited [claimant's] testimony, but whether the ALJ was clearly wrong to discredit it." *Werner v. Comm'r of Soc. Sec.*, 421 F. App'x 935, 939 (11th Cir. 2011).

**A. Ms. Martin's Physical Residual Functional Capacity**

Ms. Martin argues that the residual functional capacity "fails to account for the 'total limiting effects' of [her] severe impairments, particularly in finding that she can perform the arduous standing/walking requirements of light work." Doc. 16 at 6 (emphasis omitted). Ms. Martin argues that the ALJ "never attempts to connect the evidence summary [in his finding] to his [residual functional capacity] finding, or to any finding how the evidence is inconsistent with her statements." *Id.* at 10. Ms. Martin argues that the residual functional capacity "is simply conclusory." *Id.* Additionally, Ms. Martin argues that "her ability to fully comply with medical advice [was] hindered by her lack of medical insurance coverage." *Id.* at 12. And she argues that "the ALJ's failure to acknowledge or discuss" her obesity "is also clear error." *Id.* at 14.

The Commissioner argues that Ms. Martin "failed to undermine the substantial evidence supporting the ALJ's finding or prove that her impairments caused additional limitations on her ability to work." Doc. 19 at 6–7. The Commissioner also argues that "[t]he ALJ's decision shows he considered all of the evidence, but cited to the evidence he found most persuasive and consistent throughout the evidence that supports the [residual functional capacity]." *Id.* at 7.

After describing the pain standard, the ALJ noted that "whenever statements about the intensity, persistence, or functionally limiting effects of pain or other

symptoms are not substantiated by objective medical evidence, the undersigned must consider other evidence in the record to determine if the claimant's symptoms limit the ability to do work-related activities." R. 16.

The ALJ considered Ms. Martin's testimony about her symptoms in the analysis of Ms. Martin's residual functional capacity. R. 16–17. The ALJ summarized Ms. Martin's hearing testimony as follows:

> The claimant testified that in 2015, she had been standing up and doing hair, and her legs had started to feel tingly, like there were ants crawling up and down them. She said that she had been diagnosed then, but she had continued trying to work through it. She testified that her problems had gotten worse in 2020, when she was working for Smart Styles. She said that she was struggling, and she did not get breaks or have a chance to sit down unless business was slow. She said that it became a struggle even to cut her husband's hair at home, and she knew that she would not be able to go back into a salon environment. She testified that she had problems standing because of spinal stenosis, and later on, she had developed knee issues. She testified that her knee was okay so long as she was standing on a flat surface, but she had problems if she had to go up and down steps or walk for prolonged periods. She said that 90% of her problem was the stenosis. The claimant said that she had a seated walker that she pulled up to the stove to cook and wash dishes. She said that she could not wash a sink full of dishes without taking frequent breaks or using the walker. She said that she had started ordering her groceries from Walmart online because she had gotten to the point that she could not walk through the store leaning on the buggy and needed a wheelchair. She said that it would take her all day long to change the sheets on her bed, and sometimes she ended up needing help with that. She said that she could stand for 8–10 minutes and walk for about the same amount of time,

13

although she hurt differently when she walked. She said that she had lost a lot of strength in her arms and could hardly lift anything. She estimated that she could lift about 20 pounds but struggled with that amount. She said that she absolutely would not be able to stand and walk throughout an eight-hour day. She testified that she used Voltaren gel for her back pain, but it did not help. She said that sitting helped, but sitting messed with her sciatic nerve, and she would have aches and pains from her groin down to her knee and shooting down to her foot. She said that the pain felt like a toothache. She said that she sat in an office chair at her kitchen table because it was a little more comfortable, but she would have to get up and change positions or go lie down. She said that she had to lie down at least once a day to relieve back pain or if her medication made her dizzy or her blood sugar was out of whack. She testified that she had been having trouble affording her medications lately and had not had her antidepressant medication for two or three months. She said that she had not had her Neurontin for two months. She testified that she had been having depression symptoms and did not even want to get out of her house. She stated that in a typical week, she left the house just to go to the grocery store and to go to church. She said that she did not attend church every Sunday, depending on how badly she was hurting, but she could watch her church services on Facebook. In terms of her pain level, the claimant said that if she was just sitting and not really doing anything, her pain would be at a 2 or 3, but if she had to get up and do things, her pain would increase to a 7. She said that she would have to wear her knee immobilizer about three times a month because it would sometimes start hurting if she turned it wrong when going down a step. The claimant said that she had to elevate her legs because of the swelling. She said that her left leg swelled so badly that she could not even wear a shoe on her left foot if she did not put it on as soon as she woke up, explaining that three hours later, the shoe would not go on. She said that her doctor had told her to elevate her legs above the heart and to keep them elevated until the

14

> swelling went down. She said that within the past month,
> her toes had started turning blue.

R. 16–17.

The ALJ found "that [Ms. Martin's] medically determinable impairments could reasonably be expected to cause some of the alleged symptoms," but Ms. Martin's "statements concerning the intensity, persistence[,] and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." R. 17. The ALJ stated that "[t]he medical evidence of record does not support the dramatic limitations with standing and walking that [Ms. Martin] described in her testimony." R. 20.

In making this determination, the ALJ considered the objective medical evidence regarding Ms. Martin's type 2 diabetes, spinal stenosis, vertigo, major depressive disorder, knee pain, and obesity. R. 17–20. The ALJ specifically discussed medical records and visits where Ms. Martin was advised she could pursue further medical treatment for her back pain. R. 18 ("Dr. Nadella prescribed Neurontin and instructed her to follow up in four weeks, when they could consider a lumbar epidural steroid injection if her pain was no better. The claimant did not follow up at the Orthopaedic Center at that time.") (internal citation omitted); R. 19 ("He advised the claimant that her BMI of 52 would preclude any type of surgical intervention, and he recommended lumbar facet injections at L3–4 and L4–5.") (internal citations omitted). The ALJ noted that Ms. Martin's "orthopedic treatment

15

records indicate that she made a good recovery from her knee surgery." R. 20–21. The ALJ also acknowledged Ms. Martin's "degenerative disc disease, which is exacerbated by her obesity," recommended treatment options, and Ms. Martin's lack of follow up for further treatment or injections in 2022 and 2023. R. 21. The ALJ concluded that Ms. Martin "has not regularly sought treatment for back pain, which is inconsistent with the degree of pain and restriction she has alleged," "[s]he has not been prescribed any assistive device to aid ambulation, and there is no indication in any of her treatment records that she had been advised to elevate her legs." R. 21.

Substantial evidence supports the ALJ's finding under the pain standard. The ALJ properly applied the pain standard and clearly articulated reasons for discounting Ms. Martin's subjective allegations of disabling symptoms.

In analyzing Ms. Martin's testimony, the ALJ clearly discussed the objective medical evidence related to her complaints. R. 17–20. The ALJ recognized that Ms. Martin had presented to health care providers for: back pain, joint pain, body aches, fatigue, dizziness, diabetes, anxiety, and depression. R. 17–20. Although Ms. Martin argues that the ALJ "never attempts to connect the evidence summary to his [residual functional capacity] finding, or to any finding how the evidence is inconsistent with her statements," the ALJ clearly connected the evidence to his residual functional capacity. R. 20–21.

16

Ms. Martin argues that her "poverty excuses noncompliance" because "her ability to fully comply with medical advice [is] hindered by her lack of medical insurance coverage." Doc. 16 at 12 (emphasis omitted). By her own admission, "[t]his seems to be a development later on in her medical history." *Id.* at 12 n.12 (stating Ms. Martin "appears to have had insurance in March 2023 (and earlier)"). The ALJ did not unduly rely on Ms. Martin's financial inability to comply with medical advice in finding her subjective complaints were inconsistent with the record as a whole. The ALJ specifically acknowledged that Ms. Martin reported to her primary care provider that she "lost her health insurance and had been out of some of her medications since December [2023]." R. 20. However, the medical advice regarding Ms. Martin's back pain that she did not follow occurred *before* her loss of insurance. *See* R. 21 (noting she "was advised that she could have lumbar epidural steroid injections in June 2022" and "it was suggested she could have lumbar facet injections" in March 2023 but she did not follow up with either treatment at the time). The ALJ did not improperly consider Ms. Martin's lack of treatment because it occurred before the loss of Ms. Martin's health insurance. Also, the ALJ did not rely on the lack of treatment exclusively in making his determination.

Ms. Martin also argues that "to the extent that SSA chooses to discuss [her] daily activities as possible support for the ALJ's decision, it is well-settled as a

17

matter of SSA policy and Circuit precedent, that such activities do not contradict a claimant's claim that she is disabled." Doc. 16 at 12–13. Not only does Ms. Martin fail to make a particular argument regarding her activities of daily living, the ALJ did not improperly consider her testimony in the residual functional capacity finding. Instead, the ALJ acknowledged that pursuant to Ms. Martin's testimony, her "spinal problem was a bigger issue in terms of her ability to perform basic activities." R. 21.

Finally, with respect to her physical residual functional capacity, Ms. Martin argues that "the ALJ's failure to acknowledge or discuss" "her significant obesity" "is also clear error." Doc. 16 at 14. However, the ALJ identified obesity as a severe impairment and noted Ms. Martin's obesity or body mass index throughout his summary of the medical records. R. 13, 17–20. In summarizing his residual functional capacity finding, the Commissioner clearly noted that Ms. Martin's degenerative disc disease "is exacerbated by her obesity." R. 21. Additionally, when discussing the state agency initial review, the ALJ stated that he "reduced some of the postural activities to occasional [in the residual functional capacity] in consideration of [Ms. Martin's] obesity and her pain allegations." R. 21. Therefore, there is no error in how the ALJ considered Ms. Martin's obesity or how it impacts her functioning.

The ALJ was not "clearly wrong" to discount Ms. Martin's subjective complaints. *See Werner*, 421 F. App'x at 938–39. Ms. Martin "concedes that the

18

ALJ accurately summarized her testimony and other statements regarding her primary physical limitations." Doc. 16 at 4. Ms. Martin's overarching argument is that "the ALJ's analysis of the record is . . . conclusory without explanation." *Id.* at 14. As discussed above, the ALJ's analysis was not conclusory nor without explanation. Additionally, Ms. Martin has pointed to no evidence to support her testimony that her conditions prevent light work with the restrictions identified by the ALJ. Accordingly, there is no error in the ALJ's consideration of Ms. Martin's subjective complaints.

### B. Ms. Martin's Mental Residual Functional Capacity

Regarding Ms. Martin's mental functioning, the ALJ identified both depression and anxiety as severe impairments. R. 13. At step three of his determination, the ALJ considered whether Ms. Martin's mental impairments "meet or medically equal the criteria of listings 12.04, 12.06, or any other mental listing." R. 13. The ALJ determined that Ms. Martin had a mild limitation in "understanding, remembering[,] or applying information" and "adapting or managing oneself"; and she had a moderate limitation in "interacting with others" and "concentrating, persisting[,] or maintaining pace." R. 14–15. The ALJ noted that Ms. Martin "reported that she had no problems getting along with authority figures and had never lost a job because of difficulties getting along with other people." R. 14. And, the ALJ noted that his residual functional capacity assessment "requires a more

19

detailed assessment of the areas of mental functioning" and "reflects the degree of limitation [he] has found in the . . . mental function analysis" at step three. R. 15.

Regarding Ms. Martin's mental residual functional capacity, the ALJ discussed Ms. Martin's testimony regarding her depression symptoms, R. 16, medical visits for anxiety and depression symptoms, R. 18–19, medication used for anxiety and depression, R. 19–20, and a November 16, 2023 visit to her primary care provider where she requested "a referral for a psychiatric evaluation," R. 20. The ALJ concluded:

> The claimant has sought minimal mental health treatment consisting only of medications prescribed by her primary care provider. She has not seen a counselor or other mental health professional, and there have been no emergency room visits or inpatient admissions for psychiatric treatment.

R. 21. In making this determination, the ALJ considered medial opinions and prior administrative medical findings, including that from Eugene Fleece, Ph.D. R. 21–22. The ALJ described Dr. Fleece's opinion:

> At the reconsideration level, another psychological consultant, Eugene Fleece, Ph.D., reviewed the claimant's file on November 1, 2023, and assessed the claimant's residual functional capacity, finding that she could attend to simple, repetitive tasks for two-hour periods and if given routine breaks, could make an eight-hour day within whatever physical limitations were established. Dr. Fleece stated that the claimant would show some irritable distractibility if required to work in crowded, loud, poorly controlled workplaces, but she would function better in a well-spaced work environment. Dr. Fleece stated that the

20

claimant could handle simple, brief, non-confrontational public contacts, and she could take and use simple, direct, non-confrontations supervisory feedback. Dr. Fleece predicted that occasionally, the claimant would emit irritable behavior that might distract others but would have no major production effects. This opinion is somewhat persuasive, as the medical evidence of record supports moderate limitations in the claimant's ability to interact with others and to concentrate, persist, or maintain pace. The overall limitation to a range of simple work is well supported by the medical evidence of record; however, the opinion uses some language that is not vocationally relevant [and] is not supported by the regulations, such as restrictions on the type of supervisory feedback the claimant should receive. These aspects of the opinion are not persuasive.

R. 21–22 (internal citation omitted).

Ms. Martin argues that "the ALJ omitted assessments that [she] also has impairment of her ability to interact appropriately with supervisors." Doc. 16 at 17 (emphasis omitted). The Commissioner argues that the ALJ "explained that while the state agency prior administrative medical finding from Dr. Fleece stated [Ms. Martin] could take and use simple, direct, non-confrontational supervisory feedback, this part of Dr. Fleece['s] prior administrative medical finding was not persuasive." Doc. 19 at 9. The Commissioner also stated that "[t]he ALJ explained the restrictions on the type of feedback were not vocationally relevant terms." *Id.* at 10. The Commissioner also noted that the ALJ recounted Ms. Martin's *own* statements in her adult function report where she reported she had no problems getting along with authority figures. *Id.* (citing R. 14, 22).

21

Indeed, the ALJ found that Dr. Fleece's statement regarding supervisory limitations was not consistent with the evidence of record. R. 14, 22; *see also* R. 297 (Question: "How well do you get along with authority figures? (For example, police, bosses, landlords or teachers.)" Ms. Martin's Answer: "I have no problems."); *see also* R. 297 (Question: "Have you ever been fired or laid off from a job because of problems getting along with other people?" Ms. Martin's Answer: No.). Additionally, the ALJ's summary of the medical evidence of record did not include any such limitation regarding supervisory feedback, R. 18–20, nor has Ms. Martin pointed to any evidence in the record consistent with Dr. Fleece's opinion, *see* Doc. 16.

Ms. Martin cites a case for the position that "a 'supportive feedback' limitation is a vocationally relevant term that an ALJ may include in a hypothetical to a vocational expert and incorporate into" a residual functional capacity. *Reed v. Dudek*, No. 4:24-cv-00096-MHH, 2025 WL 967197, at *24 (N.D. Ala. Mar. 31, 2025). And, it is certainly true that had the ALJ chosen to include such terms in the residual functional capacity, that would not be error. *See Holder v. Soc. Sec. Admin.*, 771 F. App'x 896, 898 (11th Cir. 2019); *Nance v. Saul*, 781 F. App'x 912, 916 (11th Cir. 2019). However, the Court of Appeals for the Eleventh Circuit has affirmed ALJ decisions which omitted these type of terms from a residual functional capacity. *Hand v. Soc. Sec. Admin, Comm'r*, 786 F. App'x 220, 225 (11th Cir. 2019) (finding

"no error" when an ALJ found that an opinion that a claimant "would benefit from a flexible schedule, supportive feedback, casual supervision, and non-confrontational criticism" "were not factors that could 'realistically be covered by the ALJ or vocational expert in the context of a disability hearing'"); *Theil v. Comm'r, Soc. Sec. Admin.*, No. 24-11615, 2025 WL 707863, at *3 (11th Cir. Mar. 5, 2025) ("The record demonstrates that the ALJ adequately considered [the claimant's] ability to interact with supervisors by virtue of [the ALJ's] consideration of [the medical opinion 'stating that "feedback should be supportive"'] and the other evidence on the record.").

Here, the ALJ found Dr. Fleece's opinion regarding supervisory feedback "not persuasive." R. 22. In doing so, the ALJ relied upon the evidence in the record – including Ms. Martin's own statements regarding her ability to get along with authority figures – as well as the nature of the restrictions. The ALJ's decision demonstrates he considered Ms. Martin's medical conditions as a whole in concluding that Ms. Martin should have infrequent contact with the public and occasional contact with coworkers, which encompasses her interaction limitations in the workplace. Upon finding Dr. Fleece's opinion regarding supervisory feedback "not persuasive," the ALJ was not required to include it in his residual functional capacity or in his hypothetical questions to the vocational expert. The conditions in the residual functional capacity were well-explained and well-supported by the

23

evidence. The court discerns no error in the ALJ's mental residual functional capacity analysis.

## V.    Conclusion

Upon review of the administrative record, the court finds the Commissioner's decision is supported by substantial evidence and in accord with the applicable law. A separate order will be entered.

**DONE** and **ORDERED** this 17th day of June, 2026.

**ANNA M. MANASCO**
UNITED STATES DISTRICT JUDGE